Filed 7/29/21  P. v. Rosas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078127 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1102700) |
| ISABEL ROSAS, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendant and Appellant. | |
| | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on July 20, 2021, be modified as follows:

1.     On page 12, footnote 6, delete the second sentence so it now reads:

> It was Rosas who planned the kidnapping, enlisted others to help, and wanted to have the victim beaten and taken to Mexico.

2. On page 14, line 6 of the first full paragraph, delete the sentence which reads "She watched as one of the men beat Cate with a pipe."

The petition for rehearing is denied.

There is no change in judgment.

McCONNELL, P. J.

Copies to: All parties

Filed 7/20/21  P. v. Rosas CA4/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078127 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1102700) |
| ISABEL ROSAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, Shahla S. Sabet, Judge.  (Retired Judge of San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Robert F. Somers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Lynne G. McGinnis, and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

In 2013, a jury convicted Isabel Rosas of first degree murder (Pen. Code,[1] § 187, subd. (a)); kidnapping (§ 207, subd. (a)); and assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)). Rosas was sentenced to a term of 25 years to life plus eight years for the kidnapping offense.

Rosas appealed, and in an unpublished opinion, this court modified the sentence to stay the sentence for kidnapping pursuant to section 654. In all other respects we affirmed the judgment. (*People v. Rosas, et.al.* (Feb. 5, 2016, D068483) [nonpub. opn.].)

In May 2019, after the effective date of Senate Bill No. 1437, Rosas filed a pro. per. petition for resentencing under section 1170.95.

The trial court appointed counsel, received briefing, reviewed the record of conviction, and held an evidentiary hearing. The trial court found that although Rosas was not the direct killer of the victim, she was a major participant in the offense and acted with reckless disregard for human life. Accordingly, the trial court denied the petition for resentencing.

Rosas appeals challenging only the sufficiency of the evidence to support the trial court's decision. We will find there is sufficient, substantial evidence to clearly show that Rosas was the person who arranged the kidnapping, wanted the victim to be seriously harmed, recruited five young men to carry out her wishes, and could have stopped the violent assaults on the victim before he was fatally injured. In short, Rosas was clearly a major participant who acted with reckless disregard for human life. We will affirm the order denying the petition for resentencing under section 1170.95.

---

[1] All further statutory references are to the Penal Code.

STATEMENT OF FACTS OF THE OFFENSES

Both parties have set forth statements of facts taken directly from our prior opinion. We will follow that approach to providing necessary background information, taken from the summary contained in the respondent's brief.

A. *The People's Case*

In mid-September 2011, Rogelio Varela offered to pay his friend, Oscar Zuniga,[2] to drive a car that belonged to one of Varela's female friends. Oscar believed Varela planned to steal the car.

On October 4, 2011, Varela called Oscar and asked him whether he and his brothers, David and Pizana, could pick him up. Tafich and Garcia were with Oscar at this time. Oscar, his brothers, Tafich, and Garcia picked Varela up in San Bernardino in Pizana's black Ford Expedition. Varela indicated that the woman they were going to pick up in Pomona would buy gas for them. Varela told the other men not to talk to the woman and to make sure she did not know who they were.

---

[2] The prosecution jointly charged Rosas, Varela, Oscar Zuniga, David Zuniga, Jose Pizana, Daniel Garcia, and Yussef Tafich with murder, kidnapping and assault with a deadly weapon. Because they share the same last name, we refer to Oscar Zuniga and David Zuniga by their first names. Before Rosas and Varela's trial, Oscar pleaded guilty to voluntary manslaughter, kidnapping, and assault causing great bodily injury. In exchange for his truthful testimony against his codefendants, Oscar received a 22–year prison sentence for these offenses. David and Garcia, who were both 17 years old at the time of the crimes, pleaded guilty to assault by means of force likely to produce great bodily injury and false imprisonment. In exchange for their truthful testimony against their codefendants, the prosecutor agreed David and Garcia would receive a maximum of three years in prison. Tafich and Pizana did not testify at Rosas and Varela's trial.

The men traveled to Rosas's house in Pomona and she got into the Expedition. Around 8:39 p.m., Rosas used her credit card to purchase $50 worth of gas at a gas station in Pomona.

Varela, who had been whispering to Rosas, directed Pizana, who was driving, to drive them to the parking lot of the Legends Burgers (Legends) where the victim, Erick Cate, worked. Varela and Rosas got out of the Expedition, sat down on benches, and spoke to each other for about 20 to 30 minutes.

Varela returned to the Expedition; he and the other men drove to a liquor store where Varela purchased some things, and then they drove to Montclair Plaza. Varela told the men they would have to wait there until Rosas called or texted them to return to Legends. Varela told them Rosas was going to tell Cate to give her the Buick and that if he did not do so, Varela and the other men would take the car by force. Varela also said Rosas wanted them to beat up Cate, take him to Tijuana, and leave him there so he could not come back because he did not have any "papers."

At around 12:31 a.m. on October 5, 2011, Rosas contacted Varela by phone.[3] Varela then told the men, "It's time. Let's go," and the group returned to Legends in the Expedition. Cate's Buick had been moved to another space in the parking lot. All of the men got out of the Expedition and approached Cate's Buick except for Oscar, who stayed in the Expedition. Pizana opened a back passenger seat door of the Buick and Rosas got out. Pizana entered the backseat and repeatedly punched Cate in the back. Varela, Tafich, Garcia and David then joined Pizana in punching Cate. Cate

---

[3]     Both juries heard testimony from a Sprint custodian of records regarding defendants' cell phone calls between October 1 and 5, some of which corroborated the specific testimony of their codefendants.

4

was wearing underwear but no pants. When someone broke one of the windows of the Buick, Garcia and David became scared and ran back to the Expedition. Rosas remained outside the Buick during the assault, standing by the open passenger door and watching what was going on inside the car as it rocked back and forth. She said nothing and did not try to run away.

Eventually, Rosas got into the front passenger seat of the Buick and drove with Varela, Pizana, Tafich and Cate to a warehouse 10 to 15 minutes away. Oscar followed them in the Expedition and then got into the driver's seat of the Buick after it was parked. Pizana and Tafich got back into the Expedition with David and Garcia. Varela, who was seated in the back seat of the Buick behind Oscar, leaned forward and whispered to Rosas, who was seated in the front passenger seat, before he gave Oscar directions.

At around 1:47 a.m. on October 5, Rosas used her credit card to buy gas for the Buick at a gas station in Murrieta. While Oscar was putting gas in the Buick, he saw Varela sitting on the back seat and Cate lying on the floorboard with what appeared to be a bloodstained towel over his head. When Oscar moved toward the gas pump, he noticed the Buick was moving again, as if a struggle was going on inside. Oscar looked inside the rear window of the Buick and saw Varela "on all fours" like he was struggling to hold something down while the Buick was moving back and forth. Oscar testified he could hear someone "trying to scream with something over his face." The screaming was not coming from Varela's mouth.

Varela told Oscar to drive him and Cate to a dark spot because the lights in the gas station were shining inside the car. Oscar did so and then exited the Buick while Varela remained inside the car with Cate. Oscar heard someone trying to scream for a few minutes. After the screaming

5

stopped, Varela told Oscar to get back in the car and drive to the gas station, and Oscar reluctantly did so.

The men picked Rosas up at the gas station and drove south on Interstate 15 to a location in San Diego where Varela took over as the driver and Oscar got in the backseat with Cate on the floorboard next to him. Varela asked Rosas, "Where do we go?" Rosas replied, "I don't know." Varela eventually pulled over by a brushy area and told Oscar to help him drag Cate out of the car. Varela gave Oscar some magazine pages to put on his hands to help drag Cate. Rosas remained in the Buick.

Varela and Oscar dragged Cate behind a bush. Cate was not moving and did not appear to be breathing. Oscar and Varela returned to the car. Oscar testified that Rosas, who was still in the car, was wearing light-colored latex gloves and looking through the glove compartment. Oscar drove Rosas and Varela back to San Bernardino. During the drive, Rosas gave Varela a cell phone and told him to call their pastor and tell him that Cate was leaving for Florida with his ex-girlfriend. Varela used a blocking feature on his phone and left a voice mail message with the pastor around 2:13 a.m. that same morning (October 5).

During the drive, Varela and Rosas bickered about what to do with Cate's Buick. Varela told Rosas he had already done too much, and she had to get rid of the car. Rosas said Varela had not finished everything that she had paid him for. They discussed burning or crushing the Buick because of the bloodstains inside the car. When Oscar reached a point near his home, he parked and told Varela he was getting out. Two or three days later, Tafich paid Oscar $100.

In the evening on October 5, Cate's girlfriend, Monica Sanchez, went to the church that she, Cate, and Rosas regularly attended. Sanchez saw Rosas

6

there that night and told her Cate had not come home the previous night. Sanchez was unaware of Cate's relationship with Rosas. Rosas told Sanchez she had not seen or heard from Cate.[4] Sanchez spoke to the pastor about Cate's disappearance, and the pastor played Varela's phone message for her.

The next day, October 6, Sanchez reported Cate's disappearance to the police. At around 7:00 p.m. that night, authorities found Cate's Buick on fire on a dead-end street in an unincorporated area of Muscoy. All of the fabric on the back seat of the car was destroyed except for a bloodstained area underneath a piece of wood and newspaper.

Rosas's jury heard testimony that, after a church service on October 8, the pastor told Rosas that they could not find Cate. Rosas appeared to be a little surprised by the news.

Both juries heard that several days later, on October 12, 2011, Rosas reported to the police that she had been kidnapped while she was with Cate in a white car. Rosas's jury heard translations of the statements she made to the police during her interviews on October 12, 13, 17 and 18. The jury also viewed portions of the video recordings of the interviews.

During her third interview on October 17, in response to questioning by Detective Maurice Duran of the Upland Police Department, Rosas repeatedly maintained she was kidnapped, but she admitted she put gas in the Expedition and the Buick the night she was allegedly kidnapped (October 5). She stated that Varela told her to do it. Rosas identified Varela, a former coworker, as one of the kidnappers and the person who likely called the pastor. She said Varela and the other men demanded money and then beat Cate. Rosas told Detective Duran that she heard Cate screaming when they stopped to put gas in the Buick. She also stated that the men drove Cate to

---

[4]     Only Rosas's jury heard Rosas's statement.

7

another street and, when they returned, Cate was no longer screaming. They then drove to a field in San Diego or Escondido and left Cate there. Rosas also stated the men dropped her off after they drove back. When the third interview ended, Rosas accompanied the police to San Diego to search for Cate. They did not find him.

The fourth interview began late that same night (October 17) when Rosas and the detectives returned from San Diego, and it continued into the early morning hours of October 18. At around midnight, early in the interview, Rosas admitted to Detective Duran that she was not a kidnapping victim. She said the plan was for her and Varela to take Cate to Tijuana and leave him there so that Cate would have to pay someone to return to the United States. Rosas agreed to pay Varela $500 or $600 to help her. Rosas told Detective Duran she was mad at Cate and was going to take him to Tijuana because he was always asking her for money, he already owed her a lot of money, and he had lied to her about his relationship with Sanchez. Throughout the interview Rosas maintained that she did not intend for Varela and his cohorts to hurt Cate and that she told Varela not to hurt Cate.

Rosas also told Detective Duran during the interview that both Oscar and Varela beat Cate in Murrieta and that Cate's face did not appear to be hurt at that time or when they left him in San Diego. Rosas admitted it was her idea to call the pastor on the way back to San Bernardino. She also admitted that she paid Varela $500 after the kidnapping. Rosas stated she asked Varela the next day whether Cate was alive when they pulled him out of the car in San Diego, and Varela replied he did not know because he did not check Cate's pulse.

Detective James Potts interviewed Varela later that day (October 18). A video recording of the interview was admitted into evidence and played

8

only for Varela's jury.  After Varela waived his *Miranda*[5] rights, he told Detective Potts that Rosas was a former coworker and that he met Cate through Rosas.  Varela stated he had not heard that Cate and Rosas had been kidnapped.  When Detective Potts told Varela they had interviewed Rosas several times and she was blaming him "for some things," Varela claimed he "was just a tool," Rosas said Cate owed her money, and Rosas "was the one that set the whole thing up."  Varela indicated that Rosas had paid for Cate's dental work and that Rosas wanted Cate to bring back a white Buick she had helped pay for.  Varela told Detective Potts that Rosas asked him for help and offered to pay him.  Rosas wanted him to tie Cate up, break his legs and take him to Tijuana so that Cate, who was not a citizen, could see how expensive it would be to return to the United States.  Varela stated he agreed to help and recruited his friends, Pizana, Oscar, Tafich, and two of their friends, Garcia and Zuniga, to help.  Varela stated he told them they needed to "kick [Cate's] ass" and drive him to Tijuana and leave him there.

Varela also told Detective Potts that Rosas provided the men with pieces of green rope to tie up Cate and that he and Rosas went over the plan in the Legends parking lot.  Rosas told him she would park the Buick in the darkest place in the parking lot, and Varela and the other men were to approach Cate, "take him down," and tie him up.  Varela also said Rosas had "staged" the crimes so she would look like a kidnapping victim.  When Varela got in the back seat with Pizana and Cate, he told Cate in accordance with Rosas's instructions that Sanchez's father had sent him and that he (Cate) was to stay away from Sanchez.  Varela told Detective Potts that Cate was screaming loudly during the ride to Monte Vista and that Pizana and the others hit Cate.  When they stopped for gas on the way to San Diego, Cate

---

5   *Miranda v. Arizona* (1966) 384 U.S. 436.

9

was screaming and bleeding from his nose and mouth.  Varela said he stuffed a blanket in Cate's mouth, drove across the street, told Cate to be quiet, and Cate complied.

Varela told Detective Potts that when they stopped in San Diego, Rosas put on some blue latex gloves and shoved vodka from two pint-sized bottles into Cate's mouth.  Varela indicated that Rosas had instructed him to buy the vodka.  Varela thought Cate was unconscious at this time.  Rosas then instructed him to untie Cate's arms and legs, remove his shirt, and take his belt.  Varela stated he ripped off Cate's shirt, untied his arms but not his legs, and left the belt by Cate's body.  Varela indicated that Rosas directed him to pour vodka on Cate to remove any evidence and that he complied.  Varela, Rosas, and Oscar then returned to San Bernardino and went their own ways.  During the drive, Rosas persuaded him to call Cate's pastor.

Varela also told Detective Potts that Tafich called him the next day and said he was putting them at risk because their fingerprints were on the Buick.  Varela said he told Tafich they left the Buick with the keys in it by an abandoned storage business.  Tafich told him not to worry about the car.  Varela said Rosas paid him $300, and he had to split the money with the other men.

Varela told the police that Rosas told him to beat up Cate another time and that he had tried to do so.  They realized then that they would need more people.  Varela agreed to accompany the police to the location where they left Cate's body.

Both juries heard testimony that on October 18 Varela led the police to a canyon by Fairmount Avenue near Interstate 8 in San Diego, where they found Cate's decomposing body.  Cate was wearing a white tank top undershirt, blue boxer underwear, a white sock, and black pants that were

10

around his ankles. His ankles were bound with a green nylon rope. The police found a red plastic bottle cap by Cate's hip area, a second red bottle cap under his head, and two pieces of paper from a Spanish-language religious pamphlet, one under his left shoulder area and the other around his right lower leg.

An autopsy established that Cate died of "homicidal violence with head and neck trauma." Cate's injuries included six lacerations on his scalp and a fractured thyroid cartilage. The injuries were consistent with blunt trauma. Cate also had a large hole in the back of his head and neck and additional smaller holes near his ankles. The holes could have been caused by animals or foul play.

On October 26 the police searched Varela's car and found multiple pairs of blue gloves and a green rope underneath the front seat. The green rope had the same texture and color and texture as the rope found on Cate's feet.

B. *The Defense Cases*

Neither Rosas nor Varela presented any evidence. During closing arguments, Varela's counsel argued that the testimony of the coparticipants was not credible because of their agreements with the prosecution. Rosas's counsel argued she was not guilty of the charges and that it was Varela's plan to enlist the other males, to assault Cate, and to take him to Mexico by force.

DISCUSSION

Rosas contends the evidence is not sufficient to show she was a major participant in the murder and that she acted with reckless disregard for human life. At the evidentiary hearing defense counsel did not dispute that Rosas was a major participant. Instead, counsel argued then and appellate

11

counsel argues now that she did not act with reckless disregard for human life. The trial court disagreed and discussed the evidence showing her actions brought her within the range of aiders and abettors who can be convicted of murder under Senate Bill No. 1437.

## A. The Trial Court's Findings

The trial judge at the hearing was the same judge who presided over the original trial and reviewed the transcripts of the trial. The court found that Rosas was the ringleader who "coordinated, orchestrated, and implemented the entire plan." The court found Rosas's participation was "100 percent and complete." With regard to Rosas's awareness of "lethal weapons" the court found Rosas knew the five men she involved would use their bodies and fists as lethal weapons. She knew kidnapping was serious and dangerous and possibly a violent crime. Although Rosas was not present when the victim was finally killed, she was present and observed the earlier assaults and absolutely could have prevented the killing but did nothing to help the victim. The court found Rosas was a major participant in the crime and that she acted with reckless indifference to human life.[6]

## B. Legal Principles

Where there is a challenge to the factual support for a trial court decision, we review the challenge under the familiar substantial evidence standard of review. Under that standard we review the entire record and draw all reasonable inferences in favor of the trial court findings. We do not make credibility decisions or weigh the evidence. Our purpose is to determine whether there is substantial evidence in the record from which a

---

[6]   It was Rosas who planned the kidnapping, enlisted others to help, and wanted to have the victim beaten and taken to Mexico. She saw one of the men beat the victim with a pipe and did nothing to prevent the assault.

12

reasonable trier of fact could reach its conclusion.  (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.)

The principal issue here is whether appellant acted with the requisite reckless indifference.  In order for an aider and abettor of a felony murder to be validly convicted under Senate Bill No. 1437, such reckless indifference must be proved.  Our Supreme Court has clarified the meaning of the term and identified the factors courts must consider in deciding whether such indifference has been proved.

In *People v. Clark* (2016) 63 Cal.4th 522, 617-621, the court set out the factors lower courts should consider in determining whether a person was a major participant who acted with reckless disregard for human life.  Those factors include knowledge and use of deadly weapons; physical presence at the crime and opportunities to restrain the crime and/or aid the victim; duration of the felony; the defendant's efforts to minimize the risks of violence during the felony.  (*Id*. at pp. 618-623; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1022-1024.)

The trial court's discussion also tracked the rules from *People v. Banks* (2015) 61 Cal.4th 788, 794, regarding the requirements to show an aider and abettor to be a major participant in the underlying felony.

## C.  Analysis

The trial judge carefully examined the record and found Rosas was a major participant in the crime leading to the murder.  Although she was not physically present when the final fatal assault took place, the inescapable fact is there would not have been a kidnapping, an assault, or a death except for the planning and participation in the offense by Rosas.

It was Rosas who wanted the victim beaten, and according to Varela to have the victim's legs broken and be dumped in Mexico.  She was present

13

throughout the nearly two-day ordeal.  She witnessed the men viciously assault the victim who she heard screaming.  Plainly, Rosas created and supervised the crime and violence leading to the victim's death from beating and strangulation.

Rosas relies heavily on the Supreme Court's recent decision in *In re Scoggins* (2020) 9 Cal.5th 667, which held there was insufficient evidence the defendant in that case acted with reckless indifference to human life.  But the circumstances of that case were significantly different.  Here, Rosas was physically present for much of the assaultive conduct, extending over a significant period of time during which the victim was restrained.  She watched as one of the men beat Cate with a pipe.  As the trial court properly found, she could have stopped the assaults and did nothing to prevent the brutal killing.  (Cf. *id.* at pp. 677-681.)  The facts of the trial provide substantial evidence to support the trial court's decision.  There was no error.

## DISPOSITION

The order denying Rosas's petition for resentencing under section 1170.95 is affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.